IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ZORAIDA CARRUCINI, | |
| Plaintiff, | |
| v. | CIV. NO.: 14-1168(SCC) |
| TRIPLE-S VIDA, INC., | |
| Defendant. | |

## OPINION AND ORDER

Plaintiff Zoraida Carrucini, a former employee of Cutler Hammer Electrical Company, filed a complaint in the Court of First Instance in Bayamón against Defendant Triple-S Vida, Inc., "the administrator and insurer of" Cutler Hammer's disability insurance program. Docket No. 1-2, at 2. According to the complaint, Triple-S wrongly denied Carrucini long-term disability benefits. *See id.* at 2–5. Though the complaint did not mention the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, Triple-S removed the case

to federal court on the grounds that her state-law cause of action was preempted by ERISA, which provides the only permissible means for her to challenge her denial of benefits. Docket No. 1, at 2–3. Carrucini sought remand, arguing that federal jurisdiction had not been established[1] and that Triple-S had missed the deadline to seek removal. Docket No. 6, at 1–2. The Court denied Carrucini's remand motion, Docket No. 7, and after discovery the parties filed cross-motions for summary judgment, Docket Nos. 19, 28, which are now before me.[2] For the reasons I explain below, I grant Carrucini's motion and deny Triple-S's.

## I.   Factual Background

Plaintiff Zoraida Carrucini was an employee of Cutler Hammer Electrical Company, where she worked as a senior human resources representative. Her position was classified as a sedentary position, requiring continuous sitting and no other

---

1.   The argument that jurisdiction had not been established was conclusory, but Carrucini also requested "discovery for the purpose of determining whether the insurance contract is an ERISA plan." Docket No. 6, at 2. The Court agreed that discovery might be necessary to determine whether ERISA preemption in fact applied. Docket No. 7.

2.   Notably, Carrucini, in her motion for summary judgment, does not dispute that ERISA controls this case.

exertional requirements apart from the occasional climbing of
stairs. Docket No. 27-2, at 45, 47. The position also required
"constant" computer use. *Id.* at 47. Among the essential
functions of Carrucini's position was liaising between the
community and the company. Docket No. 27-2, at 49. Her
position also included external contacts such as recruiting and
participating in community programs. Docket No. 27-3, at 1.
On account of a number of medical conditions,[3] Carrucini
applied for disability insurance pursuant to her employer'
group plan. She quit working on April 10, 2012, and never
returned.

   As an employee of Cutler Hammer, Carrucini was a
beneficiary of the Group Long Term Disability Insurance Plan
("the Plan"). *See* Docket No. 27-1, at 1. This policy was issued
by Defendant Triple-S Vida, Inc., which reserved to itself "the
discretionary authority to determine [beneficiaries'] eligibility
for benefits and to construe the terms of the policy to make a
benefits determination." *Id.* at 47. To receive benefits under the

---

**3.**   According to Carrucini, these include fibromyalgia; carpal tunnel
syndrome; degenerative disc disease; severe chronic lumbar, sacral, and
cervical pain; cervical radiculopathy; lumbar and cervical spondylosis;
apnea; and major depressive disorder.

Plan, a person is required to complete a claim form. Either the employer or the person's treating physician must also complete certain parts of the form. After the form is filled out, it must be sent to Triple-S. Eligibility for benefits is determined pursuant to the Plan's definition of disability. In relevant part, this definition requires that Triple-S find that "during the elimination period," the person was

> prevent[ed] from performing with reasonable continuity the material and substantial duties of [her] regular occupation and a reasonable employment option offered to [her] by the employer and, as a result, [she] is not working at all, or [she] is working and the income [she] is able to earn is less than or equal to 20% of [her] pre-disability earnings.

*Id.* at 26. The phrase "elimination period" refers to a "period of continuous days of total disability," which "begins on the first day of" a person's disability and continues for 180 days. *Id.* at 11, 28.[4]

---

**4.** In her motion for summary judgment, Carrucini argues that the elimination period need not elapse consecutively in every case, because "one may return to work and not be required to begin a new elimination period." Docket No. 28, at 20. Triple-S acknowledges the truth of this statement, but correctly notes that it is irrelevant given that Carrucini never returned to work. Docket No. 32, at 16.

As Carrucini quit working on April 10, 2012, her elimination period began the next day, on April 11, 2012. Triple-S received Carrucini's long-term disability application on October 24, 2012, and it subsequently sent a letter to Cutler Hammer requesting certain pertinent information. During a November 20, 2012, phone call, Carrucini provided Triple-S with various information regarding her personal, health, and work histories. Yet more information was requested from Carrucini on November 27 and December 26, 2012, and after Cutler Hammer apparently didn't respond to a first request, Triple-S again asked it to provide information regarding Carrucini.

As part of Triple-S's review of Carrucini's claim, it had a clinical review prepared by Darcy Newton, a registered nurse. *See* Docket No. 27-14, at 11–16. Newton summarized Carrucini's medical records and concluded that her diagnoses were "not causing a complete loss of functional capacity." *Id.* at 16. Newton wrote that Carrucini could "sit, stand, walk and alternate continuously for 1 hour each with periods of rest." *Id.* Newton noted that Carrucini's doctors recommended that repetitive tasks be avoided. Furthermore, several of Carrucini's treating physicians determined that Carrucini could not travel

unless it was absolutely necessary.

On January 23, 2013, Triple-S sent Carrucini a letter informing her of the denial of her disability request. According to that letter, Triple-S determined that Carrucini did not experience limitations preventing her from performing her job during the elimination period. Carrucini appealed Triple-S's decision on April 24, 2013. With her appeal, Carrucini provided additional medical evidence. Triple-S had Carrucini's appeal file reviewed by two independent, non-examining medical professionals, Dr. Jaime Foland, a physician, and Dr. Marla Rodríguez, a psychologist.[5]

As part of his review, Dr. Foland spoke twice with Carrucini's rheumatologist, Dr. Miguel Ramírez-Soto. In a letter to Dr. Ramírez-Soto, Dr. Foland summarized Dr. Ramírez-Soto's diagnosis as one of fibromyalgia, chronic pain,

---

**5.**   Carrucini suggests that the independent physicians, and especially Dr. Rodríguez, were biased. *See, e.g.*, Docket No. 20, at 19 ("Dra. Rodriguez in her zeal to accommodate her review to her employer's position . . . and to its lucrative practice was blinded to the obvious."). I note, however, that without actual evidence of bias, there is nothing inherently inappropriate about a plan administrator's use of outside experts. *See, e.g.*, *Leahy v. Raytheon Co.*, 315 F.3d 11, 16 (1st Cir. 2002) ("We are aware of no case holding that a plan administrator operates under a conflict of interest simply by securing independent medical advice to aid in the evaluation process.").

neck pain, lower back pain, carpal tunnel syndrome, and osteopenia. According to the letter, Dr. Ramírez-Soto also believed that Carrucini's fibromyalgia was aggravating her depression, for which she had been prescribed lithium by a psychiatrist. Finally, the letter indicated that Dr. Ramírez-Soto had advised Carrucini not to return to work. Dr. Foland sent a copy of his letter to Dr. Ramírez-Soto asking that it be signed and returned with any additional comments; Dr. Ramírez-Soto signed and returned the letter without comments.

Dr. Foland spoke with Carrucini's neurologist, Dr. Luis Forastieri-Maldonado, following a similar procedure.[6] Dr. Forastieri had also diagnosed fibromyalgia, along with probable carpal tunnel syndrome and cervical radiculopathy. Carrucini's internist, Dr. Miguel Rodríguez-Soberal, told Dr. Foland that he, too, had diagnosed Carrucini with fibromyalgia, which he believed to be a symptom of Carrucini's depression.[7] Finally, Dr. Foland spoke with Carrucini's physiatrist, Dr. Beatriz Bartolomei-Aguilera. Dr.

---

**6.**   However, Dr. Forastieri did not return the letter from Dr. Foland.

**7.**   Like Dr. Forastieri, Dr. Rodríguez did not return the letter from Dr. Foland.

Bartolomei, who told Dr. Foland that Carrucini did not have structural problems, but instead had nerve pain; Carrucini also had a positive straight leg raise, but negative Lasegue's and no muscle atrophy. Dr. Bartolomei also found that Carrucini had frequent muscle spasms and nerve root lesions on her back. Dr. Bartolomei told Dr. Foland that she did not think that Carrucini could return to work. In addition to lithium, the doctors consulted by Dr. Foland reported that Carrucini took Cymbalta for her nerve pain and Lyrica for her fibromyalgia.

Based on his conversations with Carrucini's treating physicians, as well as his review of the other medical evidence in the record, Dr. Foland concluded that Carrucini had "spondylosis as would be expected in someone [her] age." However, Dr. Foland found no diagnostic evidence of "central or lateral stenosis which would be compromising either the nerve roots or the spinal cord." Thus, he found that there were "no physical conditions supported by the clinical evidence that are functionally impairing." Though he noted that the records revealed fibromyalgia and spondylosis, he found that they were "not functionally impairing." This was because "[f]ibro-myalgia is a treatable condition." Dr. Foland concluded that there was no evidence of a physical condition disabling

Carrucini.

Dr. Marla Rodríguez reviewed Carrucini's health from a mental health perspective. Following the same procedure as did Dr. Foland, Carrucini's psychiatrist, Dr. Flores Santa, told Dr. Rodríguez that she saw Carrucini monthly, but that in the past Carrucini had not attended treatment regularly. Dr. Santa said that in her last visit, Carrucini was "alert, fully oriented and cooperative," and that her thoughts "were coherent, logical, and relevant." Dr. Santa said that Carrucini reported problems with concentration and, occasionally, understanding instructions; in response to Dr. Rodríguez's questions, however, Dr. Santa said that in her last visit, Carrucini had been able to understand Dr. Santa. Dr. Santa said that Carrucini took lithium, Cymbalta, and Klonopin. She furthermore reported that Carrucini had initially responded positively to treatment but underwent psychiatric hospitalization in 2010 and 2013.

Dr. Rodríguez also reviewed Carrucini's psychiatric treatment notes. Reviewing the notes from Psychotherapeutic Health Systems, Dr. Rodríguez noted that Carrucini had logical, relevant, and coherent thoughts, and that her condition seemed stable from 2011 to 2013. Dr. Rodríguez further noted that treatment notes from Dr. Luis Pio Sánchez-Caso and the

Instituto para el Manejo del Dolor de Puerto Rico y el Caribe did not contain any psychological diagnoses or symptoms. However, progress notes from Carde Gómez, dated September 4, 2012, showed a diagnosis of bipolar II, depression, and major depression. Carrucini's GAF was set by Gómez at 65.[8]

Dr. Rodríguez noted that Carrucini had admitted herself to a hospital for psychiatric care on October 14, 2012, reporting suicidal ideation. Carrucini was released on October 22, 2012, with a diagnosis of bipolar disorder, with a GAF of 50. With regard to daily life activities, Dr. Rodríguez stated that Carrucini reported being able to cook, clean, and wash clothes. Carrucini reported driving, as well as attending church, receiving visitors, watching television and reading for recreation.

Dr. Rodríguez concluded that Carrucini's symptoms were not consistent with a severe psychological condition during the

---

**8.** GAF refers to the Global Assessment of Functioning, which measures, on a 1–100 scale, a person's ability to function. 2 Dan J. Tennenhouse, Attorney's Medical Deskbook § 18:10 (4th ed.). During one hospitilization, Carrucini's GAF was 50. Scores of 40 and below indicate severe dysfunction, while scores of 80 or better "signify excellent functioning." *Id.* Carrucini's scores thus reflect diminished, but not necessarily severely diminished, functioning.

elimination period. Dr. Rodríguez found a conflict in Carrucini's self-reported symptoms.[9] Given that Carrucini reported performing various activities of daily life, as well as being a caretaker for her adult son, who suffers from a mental disability, Dr. Rodríguez concluded that Carrucini's level of activity was inconsistent with an impairment of cognitive function.

On the basis of these reports, Triple-S concluded that there was insufficient evidence to support Carrucini's claims of a disability that prevented her from performing her job's essential duties.[10] Triple-S made this finding despite the Social Security Administration determining that Carrucini was disabled.

---

**9.** The primary inconsistency noted by Dr. Rodríguez, according to Triple-S's statement of uncontested facts, regards the origin or Carrucini's son's disability. Further, Dr. Rodríguez noted that Carrucini's reports of daily functions do not mention living with or caring for an adult son.

**10.** To be clear, the letter by which Triple-S informed Carrucini of its denial of her claim relies *entirely* on the analyses of Dr. Foland and Dr. Rodríguez. *See* Docket No. 27-48, at 16–28. In fact, their employer, Custom Disability Solutions, wrote a draft denial letter that is substantially identical to the letter actually sent to Carrucini. *See id.* at 30–36.

## II. Analysis

Though a motion for summary judgment is before me, the standard of review to be applied differs somewhat from the typical case. A court reviewing a denial of benefits under ERISA applies different standards of review based "upon whether 'the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Leahy v. Raytheon Co.*, 315 F.3d 11, 15 (1st Cir. 2002) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Where such discretion exists, courts apply "a deferential 'arbitrary and capricious' standard of review" to the denial of benefits. *Recupero v. New Engl. Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir. 1997) (quoting *Firestone*, 489 U.S. at 115). Otherwise, a *de novo* standard obtains. *Firestone*, 489 U.S. at 115.

Here, Triple-S contends that the arbitrary and capricious standard applies, while Carrucini contends that the a more searching review is appropriate. The policy covering Carrucini states that Triple-S is the insurer. Docket No. 27-1, at 1. In language echoing *Firestone*, the policy reserves to Triple-S "the discretionary authority to determine [the beneficiary's] eligibility for benefits and to construe the terms of the policy to

make a benefits determination." *Id.* at 47. The First Circuit has found similar language sufficient to require the use of the arbitrary and capricious standard. *See, e.g., Leahy*, 315 F.3d at 15 (giving the administrator "the exclusive right, in [its] sole discretion, to interpret the Plan and decide all matters arising thereunder"); *see also Matias-Correa v. Pfizer, Inc.*, 345 F.3d 7, 11 (1st Cir. 2003) (similar). Carrucini objects to this reasoning because the record contains no language explicitly naming Triple-S as plan administrator.

In the First Circuit, "a party may be treated as a plan administrator where it is shown to control the administration of the plan." *Law v. Ernst & Young*, 956 F.2d 364, 372 (1st Cir. 1992);[11] *see also Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 ("Proof of who is the plan administrator may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan . . . ."). Here, as noted above, the record—indeed, the plan itself—makes plain that Triple-S carries out the plan's administration, despite not being specifically designated as the

---

**11.** I note that some courts have rejected this rule. *See, e.g., Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 380 (S.D.N.Y. 2009) (explaining that the Second Circuit has rejected *Law*).

administrator. *See Hamilton*, 244 F.3d at 824 (looking at whether plan gave putative administrator authority to administer the plan); *see also Byrd v. Canadian Imperial Bank of Commerce*, 354 F. Supp. 2d 597, 607 (D.S.C. 2005) (following *Hamilton*), *aff'd*, 157 F. App'x 643 (4th Cir. 2005). I accordingly find that Triple-S is a plan administrator to which discretionary authority has been reserved. Arbitrary and capricious review therefore applies.[12]

With the matter of standards of review out of the way, I proceed to the question of whether substantial evidence supported Triple-S's denial of benefits. This is a "deferential standard of review," *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 20 (1st Cir. 2014), that is concerned with whether the

---

**12.** In the alternative, I would find that Triple-S was a plan fiduciary, which would also require the application of arbitrary and capricious review. Under ERISA, a person is "a fiduciary with respect to a plan to the extent that . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). The Plan in this case gives Triple-S such discretionary authority, making Triple-S a fiduciary with respect to the Plan. *Cf. Byrd v. Canadian Imperial Bank of Commerce*, 354 F. Supp. 2d 597, 607 n.15 (D.S.C. 2005) (finding the insurer to be a plan fiduciary under similar circumstances). And *Leahy* requires that where a benefits decision was made by a fiduciary with discretionary authority, arbitrary and capricious review be applied. 315 F.3d at 15. Thus, regardless of whether Triple-S is considered an administrator or a fiduciary, I must use the same standard of review.

administrator's "determination was reasonable," *Matias-Correa*, 345 F.3d at 12. "Evidence is deemed substantial 'when it is reasonably sufficient to support a conclusion.'" *Ortega-Candelaria*, 755 F.3d at 20 (quoting *Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 230 (1st Cir. 2010)). In undertaking this review, I note that the opinions of treating physicians are not "automatically grant[ed] 'special weight.'" *Id.* (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Likewise, "courts may not impose 'a discrete burden of explanation' on plan administrators 'when they credit reliable evidence that conflicts with a treating physician's evaluation.'" *Id.* (quoting *Black & Decker*, 538 U.S. at 834). Nonetheless, "a plan administrator 'may not *arbitrarily* refuse to credit' the opinion of a claimant's treating physician." *Id.* at 25.

According to the Plan, a person is disabled if she is prevented from performing "the material and substantial duties of [her] regular occupation," such that she is "not working at all, or [she is] working" and receiving 20% or less of her pre-disability earnings.[13] Docket No. 27-1, at 26. The Plan's defini

---

**13.** In full, the sentence refers to "the material and substantial duties of [her] regular occupation *and a reasonable employment option offered to* [*her*] *by the employer*." Docket No. 27-1, at 26. However, no party has

tion of disability thus seems to turn not on whether Carrucini could work at all, but whether she could do her specific job as a human resources specialist. And that job, according to her employer, required continuous sitting and constant computer use. The relevant question, then, is whether Triple-S had substantial evidence that Carrucini could perform these functions.

On administrative appeal, Triple-S bifurcated its analysis of Carrucini's claim into mental and physical prongs, asking an independent physician to consider each. Dr. Marla Rodríguez assessed Carrucini's mental health. She relied principally on the reports of treating mental health professionals indicating that Carrucini tended to be alert, oriented, and cooperative, with thought processes that were coherent, logical, and relevant. Dr. Rodríguez further noted that while Carrucini had reported problems with concentration and understanding, Carrucini's psychiatrist, Dr. Flores Santa, found that Carrucini had no problems understanding her. Moreover, Carrucini's self reporting indicated that she was able to perform daily life activities and take care of her disabled son. Dr. Rodríguez

discussed any such "reasonable employment option," and so I focus solely on the first clause.

found that an ability to perform these tasks was inconsistent with a conclusion that Carrucini's mental state prevented her from performing her job duties. Dr. Rodríguez did not consider Carrucini's diagnoses of fibromyalgia, though some of her treating physicians believed its origin to be psychological.

Dr. Jaime Foland considered Carrucini's claim from a physical perspective. He found that Carrucini had "no physical conditions supported by the clinical evidence that are functionally impairing." Docket No. 27-47, at 19. While Dr. Foland acknowledged that Carrucini suffered from spondylosis, he did not find it to be severe. *Id.* Further, he dismissed the idea that Carrucini's fibromyalgia could be debilitating by stating that it "is a treatable condition" that, in his opinion, "should not be causing impairment." *Id*. He noted, moreover, that it the fibromyalgia might have psychological origins. *Id.* Dr. Foland did not consider Carrucini's diagnosis of carpal tunnel syndrome.

These determinations lacked substantial evidence. The evidence in the record suggests that the principal cause of Carrucini's pain was fibromyalgia. A diagnosis of fibromyalgia was documented as early as 2008, and was certainly made by 2010; Carrucini's treating doctors, moreover, believed the

condition began substantially earlier. All of the treating physicians that Dr. Foland spoke to believed Carrucini to have fibromyalgia, and, moreover, they seemed to believe it to be debilitating. Nonetheless, Dr. Foland gave no weight to these physicians' findings for seemingly two reasons: first, because of a lack of objective evidence in the record; and second, because "[f]ibromyalgia is a treatable condition."

To the extent that Dr. Foland found no functional impairment due to a lack of objective tests, his finding cannot be sustained. As the First Circuit has held in similar circumstances, "findings of chronic pain may not automatically be dismissed by a benefits administrator for lack of confirmable symptoms." *Gross v. Sun Life Assurance Co. of Canada*, 734 F.3d 1, 22 (1st Cir. 2013). Here, as in *Gross*, "the doctors who examined [Carrucini] viewed her symptoms to be consistent with . . . fibromyalgia" and "uniformly perceive[d] her complaints of pain and limited capacity to be credible." *Id.* at 23–24. As in *Gross*, then, a lack of objective tests is not a sufficient basis for denying a disability claim based on fibromyalgia. Dr. Foland's second reason for rejecting Carrucini's claim—that fibromyalgia is treatable and "should not be causing impairment"—amounts to a rule that fibromyalgia may *never* be

disabling. Such a holding is plainly inconsistent with First Circuit precedent. *See, e.g., id.; see also Cusson*, 592 F.3d at 226 (holding that a rule stating "that fibromyalgia patients are never disabled" is "clearly wrong"); *Hawkins v. First Union Corp. Long Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) ("The fact that the majority of individuals suffering from fibromyalgia can work is the weakest possible evidence that [an individual claimant] can."). Dr. Foland's conclusion that Carrucini's fibromyalgia was not disabling thus lacked substantial evidence.

Dr. Foland's error was compounded, moreover, by his failure to compare Carrucini's functional capacity to the actual demands of her job. For example, two of Carrucini's physicians diagnosed her with carpal tunnel syndrome, *see* Docket No. 27-46, at 48; Docket No. 27-47, at 18, and stated that she could not perform repetitive tasks, *see, e.g.*, Docket No. 20-36, at 18–19, but Dr. Foland, without explanation, failed to include carpal tunnel or the inability to do repetitive tasks as a functional impairment. This, despite the fact that Carrucini's job required her to work continuously at a computer. *See* 2 DAN J. TENNENHOUSE, ATTORNEY'S MEDICAL DESKBOOK § 24:15 (4th ed.) (noting that "[p]art of the reason for increasing numbers

of [carpal tunnel] injuries is the large number of people who work at computer terminals"). Similarly, Carrucini's treating physicians agreed that she had limitations preventing her from sitting for long periods of time. *See, e.g.*, Docket No. 20-36, at 18–19. But despite the fact that Carrucini's job required constant sitting, Dr. Foland did not address these limitations. Finally, the bifurcated manner in which Triple-S had Carrucini's case reviewed prevented her diagnoses from being viewed in a holistic manner. Several of Carrucini's treating doctors viewed her fibromyalgia as aggravating her depression or vice-versa. *See, e.g.*, Docket No. 27-47, at 16–17. But Dr. Foland strongly implied that Carrucini's fibromyalgia was of psychological origin, while Dr. Rodríguez didn't address it at all. This left no one to consider whether Carrucini's mental and physical conditions together caused her any functional limitations. For these reasons, I find that Triple-S's decision to deny Carrucini benefits was arbitrary and capricious.

The next question—which the parties have not addressed—concerns the appropriate remedy. After making a finding that an administrator's decision was arbitrary and capricious, "the court can either remand the case to the administrator for a renewed evaluation of the claimant's case,

or it can award a retroactive reinstatement of benefits." *Cook v. Liberty Life Assurance of Boston*, 320 F.3d 11, 24 (1st Cir. 2003). The First Circuit takes a "flexible approach" to this question, giving the reviewing court "'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits." *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2006) (quoting *Cook*, 320 F.3d at 24). Where the record shows that the claimant is entitled to benefits, the court may award them without remanding to the administrator. *See id.* at 31. In making this decision, "the principle of ERISA deference does not deprive a court of its discretion to formulate a necessary remedy." *Cook*, 320 F.3d at 24.

Here, the record before Triple-S showed that Carrucini had been complaining of chronic pain for years, complaints about the severity of which Carrucini's treating physicians without exception found to be credible. *Cf. Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 293 n.4 (1st Cir. 2011) (rejecting the idea that the claimant would have been "able to fool so many doctors over so many years if there were little or no serious pain"). She furthermore had a host of other conditions, both mental and physical, at least some of which were supported by objective tests or history of hospitalization.

Together, this information—and the lack of evidence reasonably contradicting it—requires a finding that Carrucini was disabled under the Plan. *Cf. Gross*, 734 F.3d at 24–25 ("[T]he sustained and progressive nature of Gross's complaints, their facial credibility to the medical practitioners who personally examined her, and the objective symptoms consistent with [reflex sympathetic dystrophy]—given the absence of any method for reaching a conclusive diagnosis—support a finding of total disability.").[14] I will therefore grant a retroactive award of benefits to Carrucini.

### III.   Conclusion

For the reasons explained above, I GRANT Carrucini's motion for summary judgment, Docket No. 28, and necessarily, then, DENY Triple-S's cross-motion, Docket No. 19. Accordingly, Triple-S is ORDERED to retroactively award Carrucini

---

**14.**  I note that despite this language, the *Gross* and *Maher* courts went on to remand, rather than award benefits. *See Gross v. Sun Life Assurance Co. of Canada*, 734 F.3d 1, 27–28 (1st Cir. 2013); *Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 295 (1st Cir. 2011). They did so, however, because while the medical records in those cases supported an award of benefits, there also existed in the records video evidence that arguably contradicted the claimants' medically-determined limitations. *See Gross*, 734 F.3d at 25–28; *Maher*, 665 F.3d at 295. No such evidence contradicting the medical record exists here.

long-term disability benefits under the Plan, retroactive to October 12, 2012.

　　IT IS SO ORDERED.

　　In San Juan, Puerto Rico, this 25th day of March, 2015.

<u>S/ SILVIA CARREÑO-COLL</u>

UNITED STATES MAGISTRATE JUDGE